UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

REBECCA S. PETZNICK,                                   CASE NO: 1:21-_____

        Plaintiff,

                                                      HON._____

-vs-

UNITED STATES OF AMERICA,
SPECTRUM HEALTH SYSTEM, LAKELAND REGIONAL
HEALTH SYSTEM, d/b/a SPECTRUM HEALTH
LAKELAND, LAKELAND HOSPITALS AT NILES
AND ST. JOSEPH, INC., d/b/a LAKELAND MEDICAL
CENTER, ST. JOSEPH, EMERGENCY PHYSICIANS
MEDICAL GROUP, P.C., EPMG SOUTHWEST
MICHIGAN, PLLC, JONATHAN KRAUSS, D.O.,
MICHAEL D. O'DANIEL, D.O., JONATHAN M. BEYER, D.O.,
JENNIFER FINCH, D.O., CHRISTOPHER MILLIGAN, D.O.,
and JACOB JOHNSON, D.O., jointly and severally,

        Defendants.
_____

BARRY R. CONYBEARE (P52056)
NATHANIEL E. HARRINGTON (P74782)
Attorneys for Plaintiff
Conybeare Law Office, P.C.
519 Main Street
St. Joseph, MI 49085
P: 269-983-0561
barry@conybearelaw.com
nate@conybearelaw.com
_____

## **COMPLAINT AND AFFIDAVITS OF MERIT**

Plaintiff, through her attorneys, Conybeare Law Office, P.C. states:

### **NATURE OF THE CASE**

1.   This is a medical malpractice claim arising out of events occurring over the

course of 19 days. On March 30, 2019, April 1, 2019, and April 17, 2019, Rebecca Petznick

was treated at the ER at Spectrum Lakeland Hospital in St. Joseph for significant low back

pain and constipation. She admitted to using IV heroin to control her pain. Each ER visit resulted in discharge with instructions to treat constipation. On April 15, 2019, Rebecca saw her PCP – David Reusser, PA, at InterCare, a federally funded clinic in Benton Harbor, for bilateral side pain, chills, and fatigue. Again, she disclosed that she had used IV heroin for pain control. She also reported her interactions with Spectrum Lakeland ER. After noting Rebecca experienced "chills" and "fatigue", a urinalysis was performed. Based on results, PA Reusser suspected a kidney infection. Rebecca received injections of an antibiotic and pain medication. PA Reusser told Rebecca to follow up with Spectrum Lakeland ER if her symptoms worsened. On April 20, 2019, Medic 1 arrived at Rebecca's home responding to a 911 call. She was transported to Spectrum Lakeland ER. An MRI and consultation with a neurosurgeon on April 20 diagnosed a spinal epidural abscess. Back pain and IV drug use are red flags for spinal infection. Spinal surgery was performed on April 21 and April 24. An MSSA spinal infection was confirmed. After significant rehabilitation, Rebecca continues to have substantially impaired neurologic function, back pain, and tightness in her thighs and calves. She has numbness from her hip, down her legs, and into both feet, as well as bladder and bowel incontinence. She requires a wheelchair and other adaptive medical devices and a caregiver.

## PLAINTIFF

2.   Plaintiff was and is a resident of Berrien County, Michigan.

3.   Pursuant to MCL 600.2912d, attached are plaintiff's Affidavits of Merit of Walter A. Eisenhauer, PA-C and Jared Strote, MD. Exhibit 1 and Exhibit 2.

2

**FEDERAL QUESTION DEFENDANT**

4.   Defendant United States of America includes the U.S. Department of Health and Human Services (DHHS), InterCare Community Health Network (InterCare) and its employee David Reusser, PA.

5.   DHHS is an authorized federal agency of Defendant United States of America.

6.   At all times pertinent to this Complaint, InterCare was a corporation organized under the laws of the State of Michigan, located, and doing business in Berrien County, Michigan. At all times pertinent to this Complaint, InterCare was a Federal Qualified Health Center pursuant to 42 USC §254b and §233(g)-(n), operating under the DHHS.

7.   InterCare, at all times relevant to the allegations of this Complaint, operated a health care facility and held itself open for primary care services and treatment of the general public, including Rebecca Petznick.

8.   At all times relevant to the allegations of this Complaint, InterCare represented and held out to the public, including Rebecca Petznick, that it employed and maintained on its staff, skilled and competent personnel, including physician assistants.

9.   David Reusser, PA (PA Reusser) is a physician assistant licensed to practice in the State of Michigan, who at all times relevant to the allegations of this Complaint, practiced in Berrien County, Michigan. At all times relevant to the allegations of this Complaint, PA Reusser practiced as a physician assistant and held himself out as competent as a specialist in that field.

10. At all times pertinent, PA Reusser was an employee of InterCare.

11. At all times relevant to this Complaint, PA Reusser acted as the actual agent of InterCare, and therefore the United States of America is vicariously responsible for his

professional negligence/malpractice as set forth in this Complaint. At all times relevant to this complaint PA Reusser acted within the scope of his employment/agency in the context of a physician-patient relationship.

**NON-FEDERAL DEFENDANTS (SUPPLEMENTAL JURISDICTION)**

12. Defendants Michael D. O'Daniel, D.O., Jennifer Finch, D.O., Jacob M. Johnson, D.O., Jonathan Krauss, D.O., Jonathan M. Beyer, D.O., and Christopher Milligan (hereinafter referred to as "defendant O'Daniel," "defendant Finch," "defendant Johnson," "defendant Krauss," "defendant Beyer," and "defendant Milligan") are/were all physicians practicing the specialty of emergency medicine in Berrien County, Michigan, and at all times relevant were agents, servants, or employees of defendants Lakeland Hospitals at Niles and St. Joseph, Inc., d/b/a Lakeland Medical Center, St. Joseph, Lakeland Regional Health System, d/b/a Spectrum Health Lakeland, Spectrum Health System, as well as Emergency Physicians Medical Group, P.C., or EPMG of Southwest Michigan, PLLC.

13. Defendant Emergency Physicians Medical Group, P.C. and/or Defendant EPMG Southwest Michigan, PLLC, (hereinafter referred to as defendant Emergency Physicians") is a Michigan professional limited liability corporation and holds itself out to the public as providing medical services for pay.

14. Defendant Lakeland Hospitals and Niles and St. Joseph, Inc., d/b/a Lakeland Medical Center, St. Joseph, (hereinafter referred to as "defendant Lakeland Hospital") is a Michigan non-profit corporation that owned and operated a duly accredited medical center located in Berrien County, Michigan.

15. Defendant Lakeland Regional Health System, d/b/a Spectrum Health Lakeland (hereinafter referred to as "defendant Spectrum Health Lakeland") is a Michigan non-profit

4

corporation, and in that capacity owned and operated defendant Lakeland Hospital at Niles and St. Joseph, Inc., d/b/a Lakeland Medical Center St. Joseph, and held itself out to the public as having and furnishing medical services and facilities for pay.

16. Defendant Spectrum Health System (hereinafter referred to as "defendant Spectrum Health) is a Michigan non-profit corporation and in that capacity owned and operated an accredited medical center in Berrien County, Michigan and held itself out to the public as having and furnishing medical services and facilities for pay.

17. Plaintiff's counsel has served non-federal defendants a Notice of Intent to File Claim and Amended Notice of Intent to File Claim under MCL 600.2912b relative to treatment rendered to plaintiff, Rebecca S. Petznick, and more than 182 days have passed since service of the Notice.

## JURISDICTION AND VENUE

18. The amount in controversy exceeds $75,000.00, excluding costs, interest, and attorney fees.

19. Plaintiff properly presented Administrative Tort Claims (Tort Claims) for medical negligence to the DHHS pursuant to 28 USC §2675 via overnight UPS mail on April 5, 2021 (Exhibit 3).

20. More than 6 months have passed since mailing the Form 95, Addendum and exhibits. 28 USC § 2675(a).

21. The cause of action pled against the USA in this Complaint is the same as contained in the Tort Claims.

22. The United States of America has waived governmental immunity and consented to this lawsuit by enactment of 28 USC §1346(b)(1).

23. The claims against the Spectrum-Lakeland and EPMG defendants, and their physicians, form part of the same case or controversy under Article II of the U.S. Constitution and supplemental jurisdiction is proper pursuant to 28 USC §1367(a).

24. Subject matter jurisdiction is proper pursuant to 28 USC §1331.

25. Joinder of defendants O'Daniel, Finch, Johnson, Krauss, Beyer, Milligan, Emergency Physicians, Lakeland Hospital, Spectrum Health Lakeland, and Spectrum Health is required pursuant to FCRP 19.

26. Without these state-based defendants, the court cannot accord complete relief for the indivisible injuries suffered by plaintiff amongst the existing parties. FCRP 19(a)(1)(A).

27. Absence of these state-based defendants leaves plaintiff at substantial risk of incurring multiple, and likely inconsistent, results in concurrent federal and state malpractice litigation over the same ultimate injury and damages. See FCRP 19(a)(1)(B)(ii).

28. Joinder of defendants O'Daniel, Finch, Johnson, Krauss, Beyer, Milligan, Emergency Physicians, Lakeland Hospital, Spectrum Health Lakeland, and Spectrum Health is also permissive pursuant to FRCP 20.

29. Rebecca Petznick's right to relief against the medical malpractice defendants is joint and several if plaintiff has no comparative negligence, and arises out of the same transaction, occurrence, or series of transactions or occurrences. Common questions of law and fact to all defendants will arise in the action. Concurrent federal and state malpractice litigation over the same facts and injuries is wasteful, duplicative, and inefficient. FRCP 20(a)(2).

30. Due to statute of limitation requirements, a state court action against defendants O'Daniel, Finch, Johnson, Krauss, Beyer, Milligan, Emergency Physicians, Lakeland

Hospital, Spectrum Health Lakeland, and Spectrum Health was filed on September 23, 2021, in the Trial Court, Civil Division, Berrien County Circuit Court. The state court case should be removed to this Court as joinder of these defendants is proper under required and permissive joinder.

31. Venue is proper in the Western District of Michigan because the events giving rise to the action took place in Berrien County, Michigan.

## FACTUAL ALLEGATIONS

32. At 6:08 a.m. on March 30, 2019, Rebecca Petznick arrived in the ER at Lakeland Hospital in "significant distress," complaining of "sharp stabbing pain in her back that goes through to her abdomen." She stated the pain – rated at a 10 – had existed for 6 days. She also described chest pain and increased pain with deep breathing. Rebecca disclosed she'd had no bowel movements for several days and advised ER staff she'd used heroin the previous night to control her severe pain.

33. Physicians on duty on March 30, 2019 in the ER were defendants Krauss and O'Daniel. Rebecca's vital signs were charted as BP:0 (!) 188/104; Pulse: 110 (Tachycardia); Temp: 97.6°. Initial EKG identified sinus tachycardia and cardiac monitoring continued. Shortly thereafter, at 7:25 a.m., the EKG was interpreted as normal and monitoring ceased. Defendant O'Daniel performed an exam and noted tenderness, distension, and rigidity of Rebecca's abdomen, although no guarding. He noted no change in sensation or strength in her legs, and detected neither clonus or saddle anesthesia. Defendant O'Daniel ordered pain medication (morphine). Lab work was also ordered, including urinalysis (negative for UTI), CBC (unremarkable with a WBC at 8.3), and CMP (mild hypokalemia and potassium at 3.3). Lactic acid was normal and lipase was low. Defendant O'Daniel performed a bedside US,

identifying neither free fluid in the abdomen or signs of aortic dissection. Defendant

O'Daniel also ordered a chest and pelvic CT angio, which confirmed no evidence of aortic

dissection, but did reveal Rebecca had significant constipation. Defendant O'Daniel also

ordered a urine drug screen which returned positive for amphetamine, cocaine, and opiates.

34. Based on his evaluation, Defendant O'Daniel diagnosed Rebecca with:
- Constipation
- Chronic bilateral low back pain without sciatica
- Generalized abdominal pain

35. Rebecca was discharged with a bottle of magnesium citrate (Citroma) and a script

for suppositories (Bisacodyl/Dulcolax). By 9:13 a.m., ER staff had concluded their

evaluation and care of Rebecca and she was discharged. However, she did not have a way

home, and at 10:21 a.m., she was put in a wheelchair and rolled to the ER waiting area to

continue making calls for a ride.

36. Rebecca returned to Lakeland's ER two days later, on April 1, 2019 at 6:54 pm.

Her pain had increased. In triage she advised:

> Pt states she was seen in ED on Saturday and dx'd with constipation – pt
> was given "something to drink" pt states she had a small BM that "was
> like 2 rocks" and has now began throwing up

37. Rebecca admitted to "IV heroin use in the last 5 days for pain control." Physicians

staffing the ER on April 1 were defendants Beyer and Finch. Rebecca's vital signs initially

were: BP: 188/93 with a follow up BP: 195/102; pulse: 102 (Tachycardia); Temp: 98°.

Defendant Finch noted Rebecca appeared "distressed (due to pain." Her abdominal exam

identified "distension" and "generalized tenderness (mild)" and "no fecal impaction." Exams

to test for neurologic sensation and lower extremity muscular strength were not documented.

Defendant Finch charted "presentation concerning for SBO vs constipation vs other." Fluids,

pain control (Fentanyl) and Zofran were ordered. The medication Relistor was also ordered,

with defendant Finch noting "patient admits to recent IV heron use … her worsening

constipation is likely related to the opiates."  Lab work was also ordered, including a CBC

and CMP. CBC returned an elevated WBC at 15.1. Mild lactate elevation was also noted.

Defendant Finch reached the conclusion that the elevated WBC and lactate results were due

to Rebecca's "stress and discomfort."

38. An abdominal/pelvic CT was ordered and identified a "large stool burden." As a

result, an enema was administered, with no result. Noting Rebecca had no fever and her

tachycardia had resolved, defendant Finch directed Rebecca to follow up with her PCP in a

few days. Rebecca was encouraged to perform a daily bowel regimen – MiraLAX and

Colace – and defendant Finch issued a script for Golytely for use at home. Defendant Finch

also "strongly encouraged [Rebecca] to refrain from heroin use." Discharge diagnosis was:

constipation.

39. On April 15, 2019, Rebecca saw her PCP – David Reusser, PA at InterCare [a

federally funded clinic]. Rebecca advised PA Reusser she had been having bilateral "side

pain" for 3 weeks. She disclosed having had several visits to Lakeland's ER and being told

she had a bowel problem. PA Reusser noted Rebecca had been having "chills" and "fatigue."

Rebecca reported her bowel movements had become regular after using MiraLAX. PA

Reusser noted her past history of cocaine, THC and methadone use, and Rebecca confirmed

she had recently used IV heroin for pain control. PA Reusser performed an in-office

urinalysis – via urine dipstick – identifying:

Urine Dipstick:

| Status | Interpretation | Result |
|---|---|---|
| completed | see detail | Color: yellow. Clarity: cloudy. Glucose: negative. Bilirubin: negative. Ketones: negative. Specific Gravity: 1.015. Blood: trace. pH: 6.0. Protein: negative. Urobilinogen: normal. Nitrite: negative. Leukocytes: negative. |

40. PA Reusser charted:

> Pain is noted in the flanks especially with percussion.  UA has nitrites present as well as some leukocytes.  No blood.  Suspect possible pyelo.  Will give IM Rocephin and IM Toradol.  f/u with MD/DO.  Patient instructed to go to ER for any worsening of symptoms.

41. PA Reusser administered injections of Rocephin (Ceftriaxone) and Toradol. He issued an off-work slip for until April 17, 2019, and he directed Rebecca to return to the ER if her symptoms worsened.

42. Rebecca had no improvement in her condition, and returned to Lakeland's ER on April 17, 2019 at 6:29 pm. ER triage notes identify:

> Pt. complaining of off and on pain in her back and abdomen over the past few weeks. Pt. states she has been seen a few times for this already but things have not improved.
>
> ***
>
> Pt. states has been here several times over the past month for same complaint, and has followed up with PMD. Has recurring low back pain, flank pain, radiating up to mid-back. States was told may be constipated. Denies problems with urination.

43. Physicians in the ER on the evening of April 17, 2019 were defendants Milligan and Johnson. Rebecca's vital signs were: BP: 150/98!; Pulse: 102 (Tachycardia); Temp 97.6°. Defendant Johnson identified mild abdominal distension, but no tenderness, as well as "lower lumbar paraspinal muscle hypertonicity/spasm." Defendant Johnson ordered lab work consisting of CBC, which included elevated WBC of 12.4. CMP was also performed. An abdominal xray identified continuing constipation. Defendant Johnson consulted with defendant Milligan and the ER physicians concluded Rebecca's diagnoses as:

- Chronic abdominal pain
- Constipation
- Acute bilateral low back pain without sciatica

44. Rebecca received an injection of Toradol for pain management and oral magnesium citrate was administered. At 9:09 pm., she was discharged home.

45. Three days later, on April 20, 2019 at 8:23 a.m., Medic 1 arrived at Rebecca's

home responding to a 911 call. Medics identified:

C:     Back pain

H:     Pt states chronic over the last month and has been to ER 5 times for it and she
       states they don't know what the cause is and they treat her and send her home.

E:     alert/conscious ambulating to the truck outside in the cold with no shoes or coat
       on. Pt. states pain since 5 am this morning. In her back around lower rib cage,
       states pain goes from one side to the other and wraps around to her abdomen. Pt
       also states she was using an electric massager while she was wet from a shower
       and it fell apart and she received an electrical shock from it. Pt states that all this
       pain she is having she had prior to the electric shock. Pt will not sit still on the cot
       and continually cry out to help her. Pt. states that her hands and feet are tingly.

A:     chronic back pain

46. Medics transported Rebecca back to Lakeland's ER. ER staff included Robert

Nolan, DO (attending) and PA Scott Achramowicz. Initial vital signs were noted as:  BP

165/125 (!); Pulse: 118 (Tachycardia); Temp: 97.4° F (but increased to 99.3° F during ER

stay). PA Achramowicz noted:

> Bilateral thoracic back pain, unspecified chronicity
> Discitis
> Hx of intravenous drug use in remission
> Diagnosis management comments: Due to pain out of proportion on exam,
> no hx of trauma or previous MRI, red flag for back pain: long term IVDA-
> heroin last used 2011 will complete an MRI to further evaluate her back
> pain. She was thrashing about in bed and pulled her IV out accidentally
> due to her back pain and is so agitated that she cannot answer questions
> appropriately. Toradol was given, EMS given 50 of fentanyl in route, and
> due to her agitation will also give 1 mg of Ativan IM. She states she has a
> Hx of constipation and has abdominal pain. Her abdomen is soft and non-
> tender in all 4 quadrants. Will complete an acute abdomen series, CBC,
> ACMPA and lipase as well.
>
> XR shows mild/mod fecal load in the colon without evidence of
> obstruction/ileus. Lipase is wnl. cmp negative for acute findings. Mild
> leukocytosis is noted on cbc of 16.2.
>
> She will be placed in [observation] status pending an MRI at 5 pm.

47. The MRI identified:

   Discitis osteomyelitis involving T10-11. There is ventral and dorsal phlegmon with epidural extension of infection ventrally and dorsally spanning T9-T11. An organized fluid collection to suggest epidural abscess is not clearly identified. This has more of an appearance of an epidural phlegmon at this time. Recommend neurosurgical/orthopedic consultation …

   A Red Critical Result was communicated to PA Achramowicz at 4/20/2019 7:28 pm.

48. PA Achramowicz continued in his charting:

   MRI is positive for discitis and osteomyelitis this [sic] T10-T11 with a phlegmon formation with no definitive epidural abscess. I discussed these findings with Dr. Woods, neurosurgery, who advises to [sic] admission and keeping her NPO, with possible surgery tomorrow. Her pain is out of proportion on exam, she initially received fentanyl in route, with ativan, fentanyl and dilaudid after the MRI was complete. Vancomycin, ceftriaxone, metronidazole initiated in the ED for potential epidural abscess/phlegmon. I discussed this case with Dr. Bosis who agrees to admission. Lactic acid, blood cultures (ceftriaxone only given prior to bc), UDS and ETOH added on.

   After ativan and fentanyl have been given repeat neurological exam shows 5/5 strength to dorsiflexion and plantar flexion however she is complaining of pins and needles sensation in her legs and has a positive straight leg raise test. Strength 5/5 in bilateral arms, equal grip strength, on initial exam she was seen walking in the room around the bed. She denies any midline TTP throughout cervical/thoracic/lumbar spine. She has continued to refuse cranial nerve testing "until you get me something stronger for the pain."

49. Dr. Rafeek Woods, neurosurgery, charted his consult with PA Achramowicz:

   She presented this time with severe mid back pain which woke her from sleep with weakness, numbness and paresthesias diffusely in her legs. Her legs are so weak that she is unable to stand. The sensation in her legs is also decreased. She denies changes in her bladder or bowel control. She has a history of IVDA in 2011 and initially denied recent use but on further probing she admits to relapsing about 1 month ago. MRI survey shows evidence of spinal infection and spinal epidural abscess with cord compression.

50. Rebecca was admitted to Lakeland's ortho/neuro floor at 8:57 pm on April 20. On April 21 at 8:07 a.m., Dr. Woods performed T8-9, T9-10, and T10-11 laminectomies. Cultures from fluoroscopic guided T9-T10 disc space aspiration/biopsy returned positive for MSSA.

51. Rebecca was discharged from Lakeland to Pine Ridge Rehabilitation for monitoring of her IV antibiotic therapy treatment and rehabilitation with PT/OT. Upon admission to Pine Ridge, Rebecca was examined by Dr. Helene Johnson who noted:

Review of Systems …
- Musculoskeletal: Positive for back pain and gait problem. Negative for arthralgias;
- Neurological: Positive for weakness (lower extremities left>right) and numbness (left>right below waist);

*** 

Physical Exam …
- Musculoskeletal:  Normal range of motion. She exhibits no edema, tenderness, or deformity;
- Neurological: She is alert and oriented to person, place, and time. She displays abnormal reflex (diminished ankle and patellar reflexes). A sensory deficit (diminished left foot>right and paresthesias both legs) is present

*** 

Assessment:
1.    Thoracic discitis
2.    Status post T8-9, T9-10 an T10-11 laminectomies
3.    Sensorimotor neuropathy secondary to discitis and surgery
4.    Thoracolumbar back pain
5.    DDD (degenerative disc disease) lumbar s/p laminectomy 1997
6.    Generalized abdominal pain …

52. On August 15, 2019, due to progressive pathologic compression fractures at T8-T9, Dr. Woods performed an additional back surgery:

- T6-T11 posterior instrumentation
- Open reduction of T8 and T9 fractures
- Morselized autograft and morselized allograft
- Posterior T6-T11 arthrodesis

53. Following this surgery, Rebecca returned to Pine Ridge for continuing care and rehabilitation.

54. On November 8, Dr. Woods discharged Rebecca from his care and her discharge from Pine Ridge occurred on November 18, 2019. The final Pine Ridge skilled nursing progress note identified Rebecca's needs as a result of her neurological deficits:

> She will require a standard 16" wheelchair with standard leg rests, regular arms and a 2" wheelchair cushion. She has mobility limitations that significantly impairs her ability to participate in 1 or more mobility related activities of daily living (MRADLs) such as toileting, feeding, dressing, grooming, and bathing in her home. Her mobility issues cannot be sufficiently resolved by the use of a cane or walker. The use of a manual wheelchair will significantly improve her ability to participate in MRADLs and she will use it on a regular basis in the home. She has not expressed an unwillingness to use the manual wheelchair that is provided in the home. She has sufficient upper body function and other physical/mental capabilities needed to safely self-propel the wheelchair. She also has a caregiver who is available, willing, and able to provide assistance with the wheelchair.

> She will require a semi-electric, variable height bed with mattress and side rails when she is discharged home. She has chronic pain and neuropathy that requires an adjustable head and foot of the bed to find comfort that would not be available in a standard bed. She will need a variable height bed to allow her to get in and out of bed, transferring to a wheelchair. She is able to transfer from chair to bed with assistance.

55. Rebecca has continued to follow up with her PCP. She was also referred to a pain clinic, but the initial evaluation has not yet occurred.

56. Rebecca continues to suffer back pain, as well as pain and tightness in her thighs and calves. Neurologic function has not improved. She is unable to accurately sense her need to urinate or have a BM and has "accidents." She has numbness from her hip, down her legs, and into both feet. Rebecca's independence is gone. She cannot drive. She cannot leave her home without assistance. She cannot work. Her daughter Natasha helps her with many

activities of daily living, including grocery shopping, laundry, meal preparation, dressing, bathing, and grooming.

57. Rebecca spends her time at home, reading or watching television. She is unable to enjoy hobbies she previously enjoyed, including gardening, using her sewing machine, and shopping. She cannot physically interact with her grandchildren as she used to. All of these changes have left Rebecca feeling depressed and hopeless.

## MEDICAL NEGLIGENCE
## March 30, 2019 – Defendants Krauss and O'Daniel:

58. The applicable standard of practice or care on March 30, 2019, for emergency physicians, such as defendants Krauss and O'Daniel, rendering care to a patient such as Rebecca Petznick, required the emergency physicians to:

a. Consider spinal epidural abscess or discitis/osteomyelitis on the differential diagnosis in light of severe back pain and recent IV drug use;

b. Order C-Reactive Protein (CRP) and Erythrocyte Sedimentation Rate (ESR) lab tests;

c. With the CT order, alert radiology to the presenting history of back pain with recent IV drug use;

d. If the inflammatory markers were elevated, or the CT scan reflected any concern, then order a spinal MRI.

59. Defendants Krauss and O'Daniel breached applicable standards of care on March 30, 2019 when they failed to:

a. Consider spinal epidural abscess or discitis/osteomyelitis on the differential diagnosis in light of severe back pain and recent IV drug use;

b. Order C-Reactive Protein (CRP) and Erythrocyte Sedimentation Rate (ESR) lab tests;

c. With the CT order, alert radiology to the presenting history of back pain with recent IV drug use;

d. If the inflammatory markers were elevated, or the CT scan reflected any concern, then order a spinal MRI.

**April 1, 2019 – Defendants Beyer and Finch:**

60. The applicable standard of practice or care on April 1, 2019, for emergency physicians, such as defendants Beyer and Finch, rendering care to a patient such as Rebecca Petznick, required the emergency physicians to:

    a.    Review and consider the ER records from March 30, 2019;

    b.    Consider spinal epidural abscess or discitis/osteomyelitis on the differential diagnosis in light of recent severe back pain and recent IV drug use;

    c.    Perform and document an examination of Rebecca's back and neurologic function;

    d.    Appreciate the significance of the change in white blood cell count from 2 days prior;

    e.    Order C-Reactive Protein (CRP) and Erythrocyte Sedimentation Rate (ESR) lab tests;

    f.    Order a spinal MRI, alerting radiology to the presenting history of back pain with recent IV drug use;

    g.    Diagnose discitis/osteomyelitis and/or spinal epidural abscess.

61. Defendants Beyer and Finch breached applicable standards of care on April 1, 2019 when they failed to:

    a.    Review and consider the ER records from March 30, 2019;

    b.    Consider spinal epidural abscess or discitis/osteomyelitis on the differential diagnosis in light of recent severe back pain and recent IV drug use;

    c.    Perform and document an examination of Rebecca's back and neurologic function;

    d.    Appreciate the significance of the change in white blood cell count from 2 days prior;

    e.    Order C-Reactive Protein (CRP) and Erythrocyte Sedimentation Rate (ESR) lab tests;

    f.    Order a spinal MRI, alerting radiology to the presenting history of back pain with recent IV drug use;

    g.    Diagnose discitis/osteomyelitis and/or spinal epidural abscess.

16

**April 15, 2019 – Defendant Reusser:**

62. The applicable standard of practice or care on April 15, 2019, for a physician assistant such as defendant Reusser, when providing care to a plaintiff such as Rebecca Petznick, required defendant Reusser to:

    a.    Review and consider the ER records from March 30 and April 1, 2019;

    b.    Consider spinal epidural abscess or discitis/osteomyelitis on the differential diagnosis in light of severe back pain, chills, and recent IV drug use;

    c.    Perform and document a physical exam of Rebecca's back, including direct percussion of the spinous processes;

    d.    Order C-Reactive Protein (CRP) and Erythrocyte Sedimentation Rate (ESR) lab tests;

    e.    Order a spinal MRI, alerting radiology to the presenting history of back pain with recent IV drug use;

    f.    Diagnose discitis/osteomyelitis and/or spinal epidural abscess;

    g.    As an alternative to d-f, refer Rebecca for an immediate spinal surgery consult/work-up or to the ER with a call ahead to notify the providers to investigate for epidural abscess or discitis/osteomyelitis.

63. Defendant Reusser breached applicable standards of care on April 15, 2019 when he failed to:

    a.    Review and consider the ER records from March 30 and April 1, 2019;

    b.    Consider spinal epidural abscess or discitis/osteomyelitis on the differential diagnosis in light of severe back pain, chills, and recent IV drug use;

    c.    Perform and document a physical exam of Rebecca's back, including direct percussion of the spinous processes;

    d.    Order C-Reactive Protein (CRP) and Erythrocyte Sedimentation Rate (ESR) lab tests;

    e.    Order a spinal MRI, alerting radiology to the presenting history of back pain with recent IV drug use;

f.      Diagnose discitis/osteomyelitis and/or spinal epidural abscess;

g.      As an alternative to d-f above, refer Rebecca for an immediate spinal surgery consult/workup or to the Er with a call ahead to notify the providers to investigate for epidural abscess or discitis/osteomyelitis.

**April 17, 2019 – Defendants Milligan and Johnson:**

64. The applicable standard of practice or care on April 17, 2019, for emergency physicians, such as defendants Milligan and Johnson, rendering care to a patient such as Rebecca Petznick, required the emergency physicians to:

a.      Review and consider the ER records from March 30, 2019 and April 1, 2019;

b.      Consider spinal epidural abscess or discitis/osteomyelitis on the differential diagnosis in light of recent severe back pain and recent IV drug use;

c.      Order C-Reactive Protein (CRP) and Erythrocyte Sedimentation Rate (ESR) lab tests;

d.      Order an MRI, alerting radiology to the presenting history of back pain with recent IV drug use;

e.      Diagnose discitis/osteomyelitis and/or epidural abscess;

f.      Order an immediate neurosurgical consult and arrange for patient admission to the hospital.

65. Defendants Milligan and Johnson breached applicable standards of care on April 17, 2019 when they failed to:

a.      Review and consider the ER records from March 30, 2019 and April 1, 2019;

b.      Consider spinal epidural abscess or discitis/osteomyelitis on the differential diagnosis in light of recent severe back pain and recent IV drug use;

c.      Order C-Reactive protein (CRP) and Erythrocyte Sedimentation Rate (ESR) lab tests;

d.      Order an MRI, alerting radiology to the presenting history of back pain with receipt IV drug use;

e.      Diagnose discitis/osteomyelitis and/or epidural abscess;

f.      Order an immediate neurosurgical consult and arrange for patient admission to the hospital.

66. Breaches of the standard of care by defendants Krauss, O'Daniel, Beyer, Finch, Milligan and Johnson, as well as PA Reusser, identified above, were the proximate cause of the advancement of Rebecca's spinal epidural abscess and her residual neurologic deficits and injuries. Had these medical practitioners complied with applicable standards of care, then Rebecca's course and outcome would have been dramatically different. Within a high degree of likelihood, inflammatory markers would have been elevated at each of the 3 ER and 1 PCP visits, thus putting the practitioners on notice to search for an infectious source. Moreover, within a high degree of likelihood, a thoracic spinal MRI at each of the ER and PCP visits would have disclosed the brewing spinal/epidural infection.

67. Had Rebecca been diagnosed with the spinal infection on March 30 or April 1, she likely would have been treated with antibiotics and fully cured. Had she needed spinal surgery, it would likely have been minor and fully successful. As a result, she would likely have no residual neurologic deficits.

68. Had Rebecca been diagnosed with the epidural infection on April 15 or April 17, she would have needed treatment with antibiotics and potentially a less invasive spinal surgery. These treatments would likely have been successful and she would likely have no permanent neurologic deficits.

69. Instead, Rebecca was misdiagnosed at 4 successive visits to her local ER and PCP over 19 days, thus allowing her spinal infection to advance and cause progressive neurologic deficits. By the time she returned to the ER on April 20, the neurologic deficits and damage had progressed to the point where antibiotic and surgical intervention were not able to reverse the damage. Rebecca is left with permanent neurologic deficits and disability.

70. Breaches of the standard of care by ER defendants Krauss, O'Daniel, Beyer, Finch, Milligan, and Johnson, as well as PA Reusser, were a proximate cause of Rebecca's need for invasive treatment, including two spinal surgeries, hospitalizations, lengthy stay in a rehabilitation facility and, permanent neurological deficits, including sensorimotor neuropathy. Further, these standard of care breaches were the proximate cause of Rebecca's physical pain, suffering, mental anguish, despair, humiliation, disability, and operative scarring.

71. The medical negligence also caused Rebecca to incur significant economic losses (past, present, and future), including, but not limited to, expenditures for medical care, hospitalization, therapy, medical devices, and appliances and home modifications, the need for attendant care and replacement household services, as well as loss of work, income, and earning capacity. These injuries and damages are permanent in nature.

72. The Spectrum, Lakeland and Emergency Physician defendants are vicariously liable for the professional negligence of defendants Krauss, O'Daniel, Beyer, Finch, Milligan, and Johnson, pursuant to the doctrines of respondeat superior, employer/employee, master/servant, principal/agent (actual, implied, or ostensible) and successor corporation liability.

WHEREFORE, plaintiff requests the Court enter judgment against the United States of America, Spectrum Health, Lakeland Regional Health System d/b/a Spectrum Health Lakeland, Lakeland Hospitals at Niles and St. Joseph, Inc. d/b/a Lakeland Medical Center St. Joseph, Emergency Physicians Medical Group, P.C., EPMG Southwest Michigan, PLLC, Jonathan Krauss, D.O., Michael D. O'Daniel, D.O., Jonathan M. Beyer, D.O., Jennifer Finch, D.O., Christopher Milligan, D.O., and Jacob J. Johnson, D.O., jointly and severally, in such

20

an amount as is determined to be fair and reasonable, together with costs, interest and attorney fees.

DATE: October 13, 2021                    CONYBEARE LAW OFFICE, P.C.

                                          BY: /s/Barry R. Conybeare
                                               Barry R. Conybeare (P52056)
                                               Attorney for Plaintiff
                                               519 Main Street
                                               St. Joseph, MI 49085
                                               (269) 983-0561